FARRIS, Circuit Judge:
The Federal Republic of Nigeria, the Central Bank of Nigeria, the Nigerian National Petroleum Corporation, and Paul Ogwuma appeal the district court’s denial of their motion to dismiss on the basis of sovereign immunity. We affirm.
I.
In June 1992, James Adler, a U.S. citizen and majority shareholder of the Mexican corporation El Surtidor del Hogar, received a letter from Chief Abba Ganna Hen George describing an investment opportunity from which Adler could receive a substantial commission. The letter explained that former members of the Nigerian ruling party had used their positions to create companies and award themselves over-invoiced contracts, and that the new Nigerian government had “given its blessing for the payment of these contracts.” Adler could receive a commission, the letter explained, by arranging for the payment of one of these contracts. Adler would have to provide blank copies of El Surtidor’s letterhead and invoice statements, as well as a non-Nigerian bank account into which 130 million dollars would be transferred. After the transfer, 40% of the total would go to Adler; 50% would go to Nigerian government officials; and 10% would go for expenses.
Two months later, Adler, on behalf of and with El Surtidor, agreed to the assignment of a Nigerian government contract on which the work had been completed, but a balance remained. The underlying contract, Adler was told, was between a foreign company and the Nigerian National Petroleum Corporation for the computerization of certain Nigerian oil fields. The foreign company had apparently finished the work, but had not received full payment. Nigerian law, Adler was informed, permitted the contract to be assigned to a foreign company. Adler provided the defendants with copies of El Surtidor’s invoices and letter head, and directed that the funds be transferred to El Surtidor’s bank account in the Cayman Islands.
Adler traveled to Nigeria to finalize the agreement. After Adler signed the contract, Nigerian officials informed him that the funds could not be transferred until he paid a “short fall deposit” of $570,000 to insure against a loss in currency value during the transaction. Adler refused to pay and left the country, but the negotiations continued. Adler took subsequent trips to Nigeria in both December 1992 and May 1994, where he met with various government officials, including Nigeria’s Minister of Finance, and both the Governor and Deputy Governor of the Central Bank of Nigeria. To facilitate the transaction, Adler eventually paid not only a short fall deposit, but also numerous transfer fees, cable charges, taxes, surcharges, stamp duties, and the like, totaling over five million dollars.
*-861 In December 1993, Adler wrote the Central Bank, instructing it to transfer the funds to El Surtidor’s bank account in New York, rather than the account in the Cayman Islands.[1] The money was never paid, and Adler filed suit in district court against Nigeria, the Central Bank of Nigeria, the Nigerian National Petroleum Corporation, and eighteen Nigerian citizens.
Defendants moved to dismiss on the ground that they were immune from the jurisdiction of the district court. The court found that the defendants did not enjoy sovereign immunity because their actions fell within the “commercial activity” exception of the Foreign Sovereign Immunities Act. Nigeria, the Central Bank, the National Petroleum Corporation, and defendant Paul Og-wuma appeal.
II.
Because the defendants based then-motion to dismiss on sovereign immunity grounds, the district court’s denial of that motion is an appealable interlocutory order under the collateral order doctrine. Schoenberg v. Exportadora de Sal, S.A. de C.V., 930 F.2d 777, 779 (9th Cir.1991).
The existence of subject matter jurisdiction under the FSIA is a question of law reviewed de novo. In re Estate of Ferdinand Marcos Human Rights Litigation, 94 F.3d 539, 543 (9th Cir.1996). A district court’s factual findings on jurisdictional issues are reviewed for clear error. Schoenberg, 930 F.2d at 779.
III.
The Foreign Sovereign Immunities Act “establishes a comprehensive framework for determixiing whether a court in this country, state or federal, may exercise jurisdiction over a foreign state.” Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 610, 112 S.Ct. 2160, 2164, 119 L.Ed.2d 394 (1992). Under the FSIA, a foreign state, as well as its agents and instrumentalities, “shall be immune from the jurisdiction of the courts of the United States” unless one of several statutory exceptions applies. 28 U.S.C. § 1604. The FSIA confers original jurisdiction to the district courts over any nonjury civil action against a foreign state where the foreign state is not entitled to immunity under the Act. 28 U.S.C. § 1330. Section 1330 “provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country.” Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 443, 109 S.Ct. 683, 693, 102 L.Ed.2d 818 (1989).
Adler does not contest that the defendants fall within the purview of the FSIA. The Federal Republic of Nigeria is a foreign state as defined in 28 U.S.C. § 1603. See Joseph v. Office of Consulate General of Nigeria, 830 F.2d 1018, 1021 (9th Cir.1987). Both the Central Bank of Nigeria and the Nigerian National Petroleum Corporation are instrumentalities of the Federal Republic of Nigeria. See Verlinden, B.V. v. Central Bank of Nigeria, 461 U.S. 480, 482, 103 S.Ct. 1962, 1965, 76 L.Ed.2d 81 (1983); Caribbean Trading and Fidelity Corp. v. Nigerian National Petroleum Corp., 948 F.2d 111, 112 (2nd Cir.1991). Defendant Paul Ogwuma is allegedly an agent of one or more of these entities. Defendants are thus immune from jurisdiction unless one of several statutory exceptions applies.

*-860
A The Commercial Activity Exception

The district court held that Nigeria was not immune from jurisdiction because its conduct falls within the commercial activity exception of the Act, 28 U.S.C. § 1605(a)(2). Section 1605(a)(2) provides that a foreign state is not immune from suit in any case
in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.
The district court relied only on the third clause of § 1605(a)(2) to establish jurisdiction and Adler argues solely under that clause in this appeal. We must thus determine whether Adler’s action is (1) “based ... upon an act outside the territory of the United States”; (2) that was taken “in connection with a commercial activity” of Nigeria outside this country; and (3) that “cause[d] a direct effect in the United States.” Weltover, 504 U.S. at 611, 112 S.Ct. at 2164.
That Adler’s causes of action are based on acts outside the United States is uncontested. The dispute pertains to whether defendants’ actions were made “in connection with a commercial activity” of Nigeria, and whether those actions had a “direct effect in the United States.”

1. Were the acts forming the basis of the complaint made “in connection with a commercial activity”?

The “commercial activity” prong of the third clause of § 1605(a)(2) requires us to make two distinct inquiries: (1) whether Nigeria engaged in a commercial activity; and (2) whether the acts complained of were made “in connection with” that activity.

(a) Did Nigeria engage in “commercial activity”?

The FSIA defines “commercial activity” as:
[EJither a regular course of commercial conduct or a particular commercial transaction or act. The commercial nature of an activity shall be determined by reference to the nature of the course of conduct, rather than by reference to its purpose. 28 U.S.C. § 1603(d).
As the Supreme Court has observed, however, this definition leaves “the critical term ‘commercial’ largely undefined.” Weltover, 504 U.S. at 612, 112 S.Ct. at 2165.
Nevertheless, the Supreme Court has concluded that “when a foreign government acts, not as a regulator of the market, but as a private player within it, the foreign sovereign’s actions are ‘commercial’ within the meaning of the FSIA.” Weltover, 504 U.S. at 614, 112 S.Ct. at 2166. Because section 1603(d) requires that an act’s commercial character is to be determined by reference to its “nature” rather than its “purpose,” the issue “is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives.” Id. Rather, the court must determine “whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in ‘trade and traffic or commerce.’ ” Id. (quoting Black’s Law Dictionary 270 (6th ed. 1990)) (emphasis in original).
In Weltover, bond holders brought a breach of contract action against Argentina arising out of Argentina’s unilateral rescheduling of the maturity dates for payment on certain government bonds. Id. at 609-10, 112 S.Ct. at 2163-64. A unanimous Court concluded that Argentina did not enjoy immunity from suit for its actions. The Court concluded that the issuance of the bonds was “commercial activity,” and that the unilateral extension of the bonds’ maturity dates by presidential decree was an act made “in connection with” that activity. Id. at 617, 612, 112 S.Ct. at 2167-86, 2165. Rejecting Argentina’s argument that the issuance of the bonds was not commercial activity because the bonds were issued for a sovereign purpose, the Court explained: “it is irrelevant why Argentina participated in the bond market in the manner of a private actor; it *-859 matters only that it did so.” Id. at 617, 112 S.Ct. at 2167 (emphasis in original).
The district court ruled that Nigeria engaged in commercial activity by entering into an agreement for the assignment of a contract in exchange for consideration. We agree. The agreement assigned Adler the right to receive payment on a contract between the Nigerian National Petroleum Corporation and a foreign company for the computerization of certain oil fields in Nigeria upon which the work had allegedly been completed, but a balance remained. There is nothing uniquely sovereign about either a contract to computerize oil fields, or the act of assigning such a contract. As consideration for the assignment, Adler provided Nigeria with his company’s letterhead, invoices, and bank account number.[2] Like the issuance of the “garden-variety debt instruments” in Weltover, “there is nothing about [Nigeria’s action] (except perhaps its purpose) that is not analogous to a private commercial transaction.” Weltover, 504 U.S. at 615-16, 112 S.Ct. at 2167. Nigeria engaged in commercial activity.
Nigeria argues that it did not engage in commercial activity because (1) the contract with Adler was sovereign in nature; and (2) some of its activities were strictly sovereign. Its arguments fail.
Nigeria’s first argument — that the contract with Adler itself was sovereign in nature— relies upon our decision in MOL, Inc. v. Peoples Republic of Bangladesh, 736 F.2d 1326 (9th Cir.1984). There, MOL and Bangladesh had entered into a licensing agreement permitting MOL to capture and export rhesus monkeys. Id. at 1327. Bangladesh terminated the agreement, and MOL filed suit in the United States. Id. We concluded that the agreement concerned Bangladesh’s right to regulate imports and exports, and its right to regulate its natural resources, and as such was an agreement that only a sovereign could make. Id. at 1329. As Bangladesh’s acts were sovereign, the commercial activity exception did not apply, and Bangladesh had sovereign immunity. Id.
Nigeria contends that, like the contract in MOL, its contract with Adler concerns uniquely sovereign functions — namely “the Nigerian government’s right to distribute government funds and collect governmental revenue.” We reject the argument.
Unlike MOL, Nigeria’s contract with Adler is not sovereign in nature. In MOL, the Bangladeshi government granted a foreign corporation the right to exploit a Bangladeshi resource — a uniquely sovereign perogative— in exchange for consideration. Here, by contrast, Nigeria entered a contract assigning the right to receive payment under a service contract in exchange for consideration. This is not something that only a sovereign can do.
Moreover, under Nigeria’s argument any contract requiring a government to either pay or receive payment would be sovereign in nature because such a contract would necessarily involve either the government’s “right to distribute government funds” or its “right to collect government revenues.” Not all government contracts are sovereign in nature under the FSIA.
Nigeria’s second argument is that its activities “consisted primarily of imposing and collecting taxes, issuing governmental decrees and collecting money for the performance of official governmental acts,” and that such acts are sovereign, not commercial. Such acts are sovereign. But the FSIA does not require that every act by the foreign state be commercial for the third clause of the commercial activity exception to apply. Siderman de Blake v. Republic of Argentina, 965 F.2d 699, 709 n. 10 (9th Cir.1992). Rather, its activities must merely be made “in connection with” a commercial activity. 28 U.S.C. § 1605(a)(2).
The Supreme Court’s decision in Weltover provides an example. In Weltover, the act upon which the bond holder’s suit was based was a presidential decree extending the maturity dates on government bonds. A presidential decree is. clearly not commercial activity. But the issuance of the bonds was, and the decree was an act made “in connec *-858 tion with” that activity. The third clause of the commercial activity exception applied.
Nigeria engaged in commercial activity by entering the agreement with Adler. All acts need not be commercial activity themselves; they must merely have been made “in connection with” such activity. Nigeria’s actions meet this requirement.
Nothing in Saudi Arabia v. Nelson, 507 U.S. 349, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993), alters this conclusion. In Nelson, the Supreme Court addressed the meaning of the first clause of Section 1605(a)(2), which provides that a foreign state is not immune from suit where “the action is based upon a commercial activity carried on in the United States by the foreign state.” 28 U.S.C. § 1605(a)(2). Nelson, who had been recruited in the United States to work in a Saudi Arabian state hospital, sued both Saudi Arabia and the hospital for personal injuries. Nelson, 507 U.S at 353, 113 S.Ct. at 1475. Saudi officials had allegedly detained, tortured, and beaten Nelson for reporting safety violations at the hospital. Id. at 351-54, 113 S.Ct. at 1474-76. Nelson argued that Saudi Arabia did not enjoy immunity because his claims fell within the scope of the first clause of section 1605(a)(2). Id. at 356, 113 S.Ct. at 1477. The Court concluded that Nelson’s personal injury claims were not “based upon” Saudi Arabia’s commercial activity in the United States as required by the first clause. Id. at 363, 113 S.Ct. at 1480-81. Rather, Nelson’s claims were based on the Saudi government’s exercise of its police power — a uniquely sovereign activity. Id. at 361, 113 S.Ct. at 1479-80. In so holding, the Court noted that Congress made an important distinction between the first clause of section 1605(a)(2) and the second and third clauses. The Court explained: “Congress manifestly understood there to be a difference between a suit ‘based upon’ commercial activity and one ‘based upon’ acts performed ‘in connection with’ such activity.” Id. at 358, 113 S.Ct. at 1478. Adler’s claims need not be “based upon” commercial activity; they must merely be based upon acts made “in connection with” such activity.

(b) Were Nigeria’s actions made “in connection with” commercial activity ?

To satisfy the “in connection with” requirement, the acts complained of must have some “substantive connection” or a “causal link” to the commercial activity. Federal Ins. Company v. Richard I. Rubin & Co., 12 F.3d 1270, 1289-91 (3rd Cir.1993). Adler complains that Nigeria and the other defendants: (1) fraudulently or mistakenly induced Adler to enter the agreement; (2) breached the agreement; (3) fraudulently induced Adler to pay over five million dollars in order to have the agreement honored; and (4) negligently failed to prevent others from perpetrating the alleged fraud.[3] These acts are all substantively connected to the underlying agreement.
Nigeria engaged in commercial activity by entering the contract with Adler. Adler’s suit is based on acts made “in connection with” that commercial activity. The first prong of the third clause of the FSIA’s commercial activity exception is satisfied.

2. Did Nigeria’s acts have “a direct effect in the United States?”

Clause three of the commercial activity exception requires not only that the sovereign’s acts be made in connection with a commercial activity, but that those acts also have a “direct effect in the United States.” 28 U.S.C. § 1605(a)(2). An effect is “direct” for purposes of the commercial activity exception if it follows as an “immediate consequence” of the defendant’s activity. Welt-over, 504 U.S. at 618, 112 S.Ct. at 2168 (citation omitted). However, mere financial loss by a person — individual or corporate — in the U.S. is not, in itself, sufficient to consti *-857 tute a “direct effect.” Siderman de Blake, 965 F.2d at 710. Rather, courts “ ‘often look to the place where legally significant acts giving rise to the claim occurred’ in determining the place where a direct effect may be said to be located.” United World Trade v. Mangyshlakneft Oil Production Ass’n, 33 F.3d 1232, 1239 (10th Cir.1994)(quoting Weltover, Inc. v. Republic of Argentina, 941 F.2d 145, 152 (2nd Cir.1991), aff'd, 504 U.S. 607, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992)); see also, Gregorian v. Izvestia, 871 F.2d 1515, 1527 (9th Cir.1989) (to establish direct effect, plaintiff must show “something legally significant actually happened in the U.S.”).[4] The district court concluded that Nigeria’s actions had a direct effect in the U.S. because Adler “requested defendants to make payment in New York.” We agree.
Weltover is again instructive. The Argentinian bonds provided that payment could be made in any of several international cities, including New York, at the election of the creditor. Weltover, 504 U.S. at 609-10, 112 S.Ct. at 2163-64. The bondholders chose New York. Id. at 610, 112 S.Ct. at 2164. The Court concluded that “[bjecause New York was thus the place of performance for Argentina’s ultimate contractual obligations, the rescheduling of those obligations necessarily had a ‘direct effect’ in the United States: Money that was supposed to be delivered to a New York bank for deposit was not forthcoming.” Id. at 619, 112 S.Ct. at 2168.
The agreement required Adler to provide Nigeria with access to a non-Nigerian bank. The district court found that although Adler originally requested that Nigeria make payment under the agreement to El Surtidor’s bank account in the Cayman Islands, he later changed these instructions, requesting instead that payment be made to the company’s account in New York. Nothing in the agreement prohibited such an election. It was Nigeria’s burden to prove otherwise. Siderman de Blake, 965 F.2d at 708. It failed to do so. Nigeria was thus obligated to make payment in New York. As in Welt-over, since New York was the place of performance of Nigeria’s ultimate contractual obligation, its failure to satisfy that obligation necessarily had a direct effect in the United States. Weltover, 504 U.S. at 619, 112 S.Ct. at 2168-69.
Nigeria argues that this conclusion is flawed in two respects: 1) the district court erred in considering evidence submitted by Adler that contradicted his deposition testimony regarding the place of payment under the contract; and 2) Weltover is distinguishable, and under these facts its failure to make payment in New York as per Adler’s request did not have a “direct effect.” We reject its arguments.
With regard to Nigeria’s first argument, Adler testified at his deposition that he never changed his original instructions to Nigeria to make payment to the Caymans. However, he subsequently submitted an “errata sheet” correcting numerous aspects of his deposition testimony, including where Nigeria was to make payment under the agreement. Adler’s errata sheet stated that in December 1993, he changed the place of payment on the contract from the Cayman Islands to New York. Adler also submitted a similar declaration in support of his opposition to Nigeria’s motion to dismiss. A letter addressed to the Central Bank changing the place of payment from the Caymans to New York was attached as an exhibit to the declaration.
Nigeria argues that the district court erred in considering both the errata sheet and the declaration. According to Nigeria, the errata sheet was neither timely nor proper under FRCP 30(e), and the declaration was a sham “generated solely to create an issue of fact.”
Nigeria’s evidentiary arguments rest on a misunderstanding of the procedures a district court must follow in making a juris *-856 dictional ruling under the FSIA. Summary judgment procedures do not control. Rather, where a plaintiff alleges that his claim is based on a foreign state’s commercial acts, the defendant has the initial burden of establishing that it is a sovereign state. See Export Group v. Reef Industries, 54 F.3d 1466, 1470 (9th Cir.1995) (holding that defendant was entitled to immunity because it established that it was an “agency or instrumentality of a foreign state” unless one of the FSIA’s exceptions applied); Gates v. Victor Fine Foods, 54 F.3d 1457, 1463 (9th Cir.1995) (same). If the foreign state succeeds, it is presumptively immune. Export Group, 54 F.3d at 1469. The plaintiff then has the burden of going forward with the evidence by offering proof that an FSIA exception applies. Gates, 54 F.3d at 1463. Once the plaintiff has done so, the defendant must prove by a preponderance of the evidence that the asserted exception does not apply. Id.
Under this procedure, the district court did not err with regard to either the errata sheet or the declaration. As the district court noted, Nigeria’s FRCP 30(e) objection to the errata sheet was mooted by Adler’s introduction of the declaration. The parties agreed that the defendants were presumptive!y immune unless an exception applied. Adler thus had the burden of offering evidence that an exception applied. With regard to the “direct effect” prong of the commercial activity exception, Adler submitted the declaration and the letter. This evidence alone was sufficient to carry Adler’s burden on this point; the errata sheet was not necessary.
Nor did the district court err in considering Adler’s declaration. A district court “may properly look beyond the complaint’s jurisdictional allegations and view whatever evidence has been submitted to determine whether in fact subject matter jurisdiction exists.” Bouryer v. U.S. Dept. of Air Force, 875 F.2d 632 (7th Cir.1989). A district court “has considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction.” Foremost-McKesson, Inc. v. Islamic Republic of Iran, 905 F.2d 438, 449 (D.C.Cir.1990).
As Nigeria points out, we have permitted district courts to disregard “sham” affidavits that contradict deposition testimony submitted solely to generate a issue of fact for summary judgment purposes. Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 266-67 (9th Cir.1991). But this is not a summary judgment motion.
Summary judgment is intended to avoid a useless trial before a finder of fact. See Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 627, 64 S.Ct. 724, 728-29, 88 L.Ed. 967 (1944). Courts have found that a party may not automatically avoid this screening mechanism by submitting affidavits that contradict his or her deposition testimony. See, e.g., Kennedy, 952 F.2d at 266-67. But on the immunity issue, the district court is the finder of fact. As there is no screening mechanism to avoid, the purpose of excluding contradictory affidavits is lost. The district court should consider all evidence before it in resolving the immunity issue. See Cargill Intern., S.A v. MIT Pavel Dybenko, 991 F.2d 1012, 1019 (2nd Cir.1993) (“In resolving the jurisdictional dispute, the district court must review the pleadings and any evidence before it, including affidavits.”). The contradictory nature of an affidavit merely affects its weight.
Further, even at the summary judgment stage, a district court is not required to disregard contradictory affidavits. In fact, before a district court is even permitted to do so, it “must make a factual determination that the contradiction was actually a sham.” Kennedy, 952 F.2d at 267. The district court made no such finding. To the contrary, it found that Adler requested payment to be made in New York, despite Adler’s deposition testimony to the contrary.
Nigeria’s second argument is that its failure to make payment in New York under Adler’s request is not a “direct effect in the United States” because nothing “legally significant” happened here. Nigeria argues that unlike Weltover: (1) the terms of the agreement did not require it to make payment in New York; (2) it never made any payments to New York; (3) Adler originally requested payment elsewhere; and (4) Adler *-855 was merely using the New York bank as an intermediary for the transfer of funds. These factual distinctions, however, do not alter the result.
The terms of the agreement permitted Adler to designate a non-Nigerian bank as the place of payment without limitation. He chose a New York bank. Nigeria presented no evidence that such a designation was prohibited by the agreement. It was its burden to do so. Siderman de Blake, 965 F.2d at 708. Nigeria was contractually obligated to make payment in New York. Its failure to perform there thus has “legal significance.”
Regarding the second distinction, the Welt-over Court noted that Argentina had made several interest payments in New York before announcing that it was rescheduling the payments. Weltover, 504 U.S. at 619, 112 S.Ct. at 2168-69. However, the “direct effect” had nothing to do with the fact that Argentina made interest payments; it resulted from Argentina’s failure to make principal payments once they were due. Id. The fact Nigeria never made any payments to New York does not change the fact that Nigeria failed to make payments there once they were due. As in Weltover, this failure had a “direct effect in the United States.”
That Adler originally requested payment elsewhere is not relevant. Adler ultimately designated New York as the place of payment; Nigeria failed to pay.
Nigeria’s final argument — that there was no “direct effect” because Adler was merely using New'York bank as an intermediary — is its most substantial. It nevertheless fails for two reasons.
The argument rests on a challenge to the district court’s factual finding that the New York bank account designated by Adler belonged to El Surtidor. Nigeria argues that the account actually belonged to Banca Serfin, a Mexican bank, and as such was merely being used as a transfer point between Nigeria and El Surtidor’s account in Mexico. We understand the argument, but we must accept the district court’s factual findings on jurisdictional issues unless they are clearly erroneous. Schoenberg, 930 F.2d at 779. The district court’s finding is -not clear error.
In his declaration, Adler described the New York account as “my account.” However, two letters, attached as exhibits to the declaration, are less than crystal clear on the issue. The letter to the Central Bank directs it to transfer the funds to
account number 1101-WA-851091-000, in the name of Banca Serfin, [S.A.], being ‘El Surtidor del Hogar’, [S.A de C.V.], and/or Jaime E. Adler beneficiaries thereof.
The second letter directs Banca Serfin to accept payment to the same account “to which the beneficiaries are ‘El Surtidor del Hogar’, S.A de C.V. and/or Jaime Adler ... in the name of Banca Serfin.” Whether the account belonged to El Surtidor or Banca Serfin may be open to dispute. However, we can not say that the district court’s finding that the account belonged to El Surtidor is clearly erroneous. For purposes of this appeal, the account belonged to El Surtidor. Nigeria’s argument that the New York bank was merely being used as an intermediary to transfer funds fails.
Further, even if the account belonged to Banca Serfin, and the New York bank was only being used as an intermediary, Nigeria’s failure to make payment in New York nevertheless had a “direct effect” in the United States under Weltover. Nigeria was legally obligated to make payment in New York. Whatever Adler, or Banca Serfin, was planning to do with the money thereafter is not an issue.
Moreover, Nigeria’s rebanee upon United World Trade, Inc. v. Mangyshlakneft Oil Production Ass’n, 33 F.3d 1232 (10th Cir. 1994), is misplaced. United World Trade, an American corporation, entered a contract with Mangyshlakneft Oil Production, an instrumentality of the Repubhc of Kazakhstan, for the sale of Khazakhstani crude oil. Id. at 1235. Under the contract, MOP was to de-bver oil to UWT’s buyer in Sicily. UWT was required to send 97% of the price paid by its buyer to MOP in Paris. Id. In practice, UWT’s buyer would forward payment for the oil to a London bank. Id. at 1237. That bank would transfer the funds to New York for conversion into U.S. dollars, 97% of which would be sent to MOP’s account in Paris; the *-854 remainder would go to UWT in Denver. Id. at 1235. After several shipments, MOP breached, and UWT filed suit in the United States. Id. at 1236. The Tenth Circuit held that MOP’s acts did not have a “direct effect” in the United States. Id. at 1239-40. Both MOP and UWT were to perform their contractual obligations in Europe: MOP was to deliver oil to Sicily; UWT was to pay MOP in Paris. Id. at 1238. The court concluded that the banking transfers, even if necessary, “were only tangentially related to the performance of the parties contractual obligations” and were thus “simply too attenuated from the defendants’ actions to be considered a ‘direct effect.’ ” Id.
Nigeria was obligated to make payment in New York. Nigeria’s acts had a direct effect in the United States.
IV.
Conclusion
Nigeria’s actions were made in connection with Nigerian commercial activity, and those actions had a direct effect in the United States. The FSIA’s commercial activity exception therefore applies, depriving Nigeria of its sovereign immunity.
AFFIRMED.

. In his deposition, Adler stated that he never altered his instructions directing Nigeria to make payment to the Cayman Islands. Approximately four months later, however, Adler submitted an "errata sheet" correcting several aspects of his deposition testimony, including the place of payment under the contract. The errata sheet stated that on December 13, 1993, Adler instructed the Central Bank of Nigeria to make payment to account number 1101-WA-851091-000 at the Swiss Bank Corporation, New York, N.Y. In opposition to Nigeria’s motion to dismiss, Adler submitted a declaration stating the same, and identifying the New York account as belonging to Adler. Adler attached two letters as exhibits to his declaration. One directs the Central Bank to make payment to the account at the Swiss Bank Corporation "in the name of Banca Serfin ... being 'El Surtidor del Hogar’ ... and/or Jaime E. Adler beneficiaries thereof.” The other directs Banca Serfin to receive payment from the Central Bank and to credit the same New York account "to which the beneficiaries are 'El Surti-dor del Hogar' ... and/or Jaime Adler ... in the name of Banca Serfin, S.A.” The district court concluded that Adler did, in fact, change the transfer instructions, and that the New York account belonged to El Surtidor.

. Engaging in commercial activity, however, "does not require the receipt of fair value, or even compliance with the common-law requirements of consideration.” Weltover, 504 U.S. at 616, 112 S.Ct. at 2167.

. Specifically, Adler’s Complaint contained the following nine claims for relief against Nigeria: breach of contract, fraud, recission — mistake of law, recission — fraud, recission — mutual mistake of fact, intentional infliction of emotional distress, negligent infliction of emotional distress, conspiracy to commit fraud, and RICO violations. The Complaint also contained a claim against Adler’s Nigerian attorney, C. Obido, for breach of fiduciary duty.
Adler's First Amended Complaint, filed after the district court's jurisdictional ruling but before Nigeria noticed this appeal, added a claim for negligent failure to prevent the alleged fraud.

. The Supreme Court did not expressly adopt the Second Circuit's "legally significant acts" test in Weltover. The Second Circuit has nevertheless subsequently applied that test, reasoning that the Supreme Court "used a similar analysis.” Antares Aircraft, L.P. v. Federal Republic of Nigeria, 999 F.2d 33, 36 (2nd Cir.1993). The Tenth Circuit has followed the Second in applying the "legally significant acts" test subsequent to the Supreme Court's decision in Weltover. See United World Trade, 33 F.3d at 1239. The Eighth Circuit has also acknowledged the test's survival. See General Elec. Capital Corp. v. Grossman, 991 F.2d 1376, 1385 (8th Cir.1993).